Ernest L. WILKINSON and Alice L. Wilkinson

v.

The UNITED STATES.

No. 456–57.

United States Court of Claims.

June 6, 1962.

John W. Cragun, Washington, D. C., for plaintiffs. Robert Ash and Ash, Bauersfeld & Burton, Washington, D. C., on the brief.

Jerry M. Hamovit, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., on the brief.

LARAMORE, Judge.

Taxpayers [1] seek to recover income tax alleged to have been wrongfully collected from them for the calendar year 1951. They aver that the Commissioner of Internal Revenue erroneously disallowed the major portion of plaintiffs' claimed deduction for charitable contributions. The Commissioner of Internal Revenue allowed a portion of the deduction but disallowed the remainder on the ground that the amount contributed exceeded the le-

[1]. Although the action is brought jointly by husband and wife, inasmuch as the controversy pertains to the activities of the husband, we shall use the terms "plaintiff" and "taxpayer" to refer to Ernest L. Wilkinson.

gally permissible deduction of 15 per centum of taxpayers' adjusted gross income.

In addition, the Commissioner of Internal Revenue asserts a counterclaim owing to plaintiffs' failure to include in ordinary income the value of this charitable gift.

The facts, as determined by the commissioner of this court, are not objected to by either party. Hence, they are adopted by the court without exception. We shall refer to these facts, in the course of this opinion, as they relate to the issue being discussed.

There are three issues involved. The first issue is whether plaintiff is entitled to deduct 15 percent of his reported adjusted gross income for the year 1951 as a charitable contribution, or whether he is limited to 15 percent of the amount attributable to that year after spreading an amount earned as a legal fee over the period of years in which the fee was earned, as provided for under 26 U.S.C. (1939 I.R.C.) § 107(a) (1952 Ed.). The facts relevant to the above issue are these: Plaintiff was the principal attorney for the Confederated Bands of Ute Indians in several actions before this court. The litigation extended over 17 years and was concluded when this court, pursuant to a stipulated agreement by the parties that judgment should be entered for an agreed amount, awarded the Ute Indians four judgments totaling $31,938,473.43. The attorneys' fees amounted to $2,794,616.34, or eight and three-fourths percent of the judgments.

As a result of these fees, which plaintiff shared with others, Wilkinson reported gross income in 1951 of $1,266,625.20. Since plaintiff had worked on these cases for more than 17 years, he elected to limit the tax attributable to the legal fee in the manner provided for under section 107(a) of the Internal Revenue Code of 1939.

That section, as effective in 1951, reads:

"§ 107. Compensation for services rendered for a period of thirty-six months or more and back pay—(a) Personal services.

"If at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual."

In effect, taxpayer limited his tax liability for the year 1951 by determining what his taxes would have been had he been paid ratably over the 17-year period preceding the date of receipt. The defendant concedes that it was proper for taxpayer to limit his 1951 tax in this manner. However, in computing the net taxable income for 1951, plaintiff listed contributions to charity in the total amount of $203,243.48. Plaintiff claimed a deduction of $189,993.78, which sum was 15 percent of his reported adjusted gross income, the legal maximum then permitted as charitable deductions. In March 1954, the Commissioner of Internal Revenue determined and collected a deficiency in tax for 1951 on the ground the contributions were limited to 15 percent of the amount allocated to 1951 under the section 107(a) computation, rather than to 15 percent of the total 1951 adjusted gross income as reported by the taxpayer. Hence, $152,115.15 of $189,993.78 deduction was disallowed and added to 1951 net income which resulted in an asserted tax deficiency of $79,842.61.

Defendant agrees that under the provisions of 26 U.S.C. (I.R.C.1939) § 23(o) (1952 Ed.) plaintiff is entitled to an allowable deduction of 15 percent of his adjusted gross income for charitable contributions.

It would appear then that the legal issue is whether the taxpayer, in computing his 1951 income tax in accordance with the provisions of section 107(a), acquired a new adjusted gross income for deduction purposes. The Government contends that when the plaintiff computed his tax under the provisions of section 107(a) he then limited his deduction to 15 percent of the amount attributable to 1951. We do not agree with this contention. The 1939 Internal Revenue Code provides:

"Sec. 23. Deductions from gross income

In computing net income there shall be allowed as deductions:

  *    *    *    *    *    *

"(o) Charitable and other contributions

"In the case of an individual, contributions or gifts payment of which is made within the taxable year to or for the use of:

  *    *    *    *    *    *

to an amount which in all the above cases combined does not exceed 15 per centum of the taxpayer's adjusted gross income. * * *"

Clearly, taxpayer is permitted a deduction of 15 percent of his "adjusted gross income." Adjusted gross income has a definite meaning in tax law, it is the amount remaining from gross income after allowing deductions limited to business expenses and losses from sales or exchanges of property.

Inasmuch as section 23(o) requires that plaintiff's 1951 charitable deduction be limited to 15 percent of his 1951 adjusted gross income, for the Government to prevail it must establish that the effect of applying section 107(a) is to reduce plaintiff's 1951 gross income and consequently his 1951 adjusted gross income. We do not construe section 107(a) as having this effect. Section 107(a) states that it is applicable when at least 80 percent of the total specified compensation earned over a period of more than three years is included in the gross income of any individual for a particular year. This negates any contention that

gross income for the year of receipt is reduced if the tax paid on that amount is limited by the computation authorized under section 107(a). We are of the view that section 107(a) merely provides a method of limiting the tax due in the year of receipt of that compensation. It does not go back and reopen prior years' taxes. Albert C. Redpath, 19 T.C. 470. The section merely provides that the tax for the year of receipt shall not be greater than the aggregate of taxes had the compensation been included in gross income ratably over the period the work was performed. The intention was to adjust only the tax. It did not purport to have anything to do with the computation of adjusted gross income. Since plaintiff's adjusted gross income remained the same, and plaintiff is entitled to a deduction based on this amount, it follows that any deduction allowable must be taken in that year or not at all. 26 U.S.C. (I.R.C.1939) § 43 (1952 Ed.)

It should be noted that section 107(a) is a relief statute and should be interpreted to achieve the purpose Congress intended which was the avoidance of tax inequities which would result when a cash basis taxpayer receives in one year the fruits of several years' labor. A narrow interpretation of this section would deny taxpayer the benefits of the relief intended.

The defendant relies on the case of Thayer v. Commissioner, 12 T.C. 795, in support of the theory that the aggregate tax due may be determined only by recomputing the taxes for each component year under the provisions of section 107(a). In that case the taxpayer received a legal fee in 1944 on which he was entitled to limit his tax under the provisions of section 107(a). The taxpayer was seeking a medical expense deduction to the extent it exceeded five percent of his adjusted gross income. Thus, the higher the adjusted gross income, the lower the permissible medical deduction. The Tax Court concluded that adjusted gross income for 1944 should include only that part of the fee allocable

to that year. Admittedly, the result we have reached in the instant case is contrary to the result reached by the Tax Court.

To the extent that this opinion is in conflict with the Tax Court's decision in the Thayer case, supra, we can only say that we disagree with that court's interpretation of section 107(a).

■ We conclude that plaintiffs were entitled to a charitable deduction to the extent of 15 percent of their full adjusted gross income, which was not diminished by the limitation of their tax liability for the year pursuant to the provisions of section 107(a).

The second issue, raised by the defendant's counterclaim, is whether the plaintiff is required to include in 1951 income the value of a contract right to receive income. This contract right was donated to charity and is the basis for the deduction discussed in the first issue.

In 1932, Captain Raymond T. Bonnin entered into two contracts to represent the Ute Indians. In 1935, Bonnin assigned his contracts to a New York law firm, retaining an interest as to contingent compensation while continuing to work on the claims. In 1937, the New York law firm dissolved, but Wilkinson, who was a member of that firm, continued to represent the Ute Indians. In 1938, plaintiff purchased from Bonnin 44.79 percent of Bonnin's contingent fees for $12,092.17. At this time there was much uncertainty as to the extent of the Indian claims and even greater uncertainty as to whether the claims could ever be collected. However, in 1950, this court entered judgments in favor of the Ute Indians in the amount of $31,-938,473.43, and in 1951 this court awarded legal fees for services rendered to the Ute Indians in a total amount of $2,-794,616.43. Bonnin's share of this fee was $427,245.53. Of this amount, 44.79 percent ($191,363.28) representing the amount purchased by plaintiff in 1938, and assigned by him by deeds of gift to charitable institutions in September of

1951, was distributed to said institutions. The plaintiff contends that the value of this gift is not attributable to income. The defendant asserts that it is.

The defendant's counterclaim is predicated on the contention that plaintiff made an assignment of anticipated income. In support of its position, the defendant relies on several landmark decisions which tax the anticipatory assignment of income as ordinary income to the assignor. Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81; Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75; Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055; Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731. We have no dispute with the principles expounded in these decisions, but we feel that defendant's reliance on these principles in the instant action is misplaced. The cited cases on anticipatory assignments of income have arisen primarily in the context of gratuitous, intrafamily assignments, rather than as here from arm's-length bargaining transactions. Here the income to be earned was attributable to Bonnin rather than plaintiff. Taxpayer, in a bona fide sale, purchased the right to receive this income if and when it became due. Hence, we are not concerned with the problem of income splitting to avoid taxation or of assigning income while retaining control of the corpus. Thus, cases cited in this area are inapposite because we first must determine whether the right assigned was income or property. If it is income, then the position taken by the defendant is correct and it must prevail. However, if the right assigned is property, within the framework of the statutes, then the taxpayer must prevail. In an arm's-length transaction the assignor of a personal services contract right is taxed on the consideration received, and the assignee is taxed on any amount ultimately collected under the assignment in excess of his cost. Cotlow v. Commissioner, 2 Cir., 228 F.2d 186. Since, absent the gift to charity, taxpayer would be taxed on this excess upon receipt either as

ordinary income or capital gain, we are concerned here with determining which treatment is applicable. If taxpayer's economic gain is "property" it qualifies for the favorable tax consequences on gifts of "property" provided for under the Treasury regulations.[2] In our opinion, save for the fact our problem involves a charitable deduction, other courts would reach the same conclusion by approaching the issue on the basis that the transaction did not involve a sale or exchange. P. N. Fahey, 16 T.C. 105; Hale v. Helvering, 66 App.D.C. 242, 85 F.2d 819. However, it is our opinion that the issue is best resolved by a definitive approach to the term "capital asset," [3] since the concept of capital gains and losses is applicable only with regard to a capital asset. 26 U.S.C. (I.R.C.1939) §§ 117(2, 3, 4), and (5) (1952 Ed.).

In effect, plaintiff contends that he became the assignee of a property right when he purchased the right to receive future income under the contract, and that this property right can be donated to charity and be subjected to favorable tax consequences. This position, of course, assumes that the gift was actually "property" within the definition of the regulations, which, in turn, has been construed by the courts to be limited to property treated as capital assets. The definition of a capital asset must be nar-

rowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L. Ed. 29. It is true the Treasury regulations treat favorably gifts of "property" to charity. It is also true that contract rights are generically deemed property rights. Whether they are "property" for tax purposes, however, may be another matter. As this court stated in Arnfeld v. United States, 143 Ct.Cl. 277, 287, 163 F.Supp. 865, cert. den. 359 U.S. 943, 79 S.Ct. 722, 3 L.Ed.2d 676, "the concept of 'property' is not necessarily controlling in matters of taxation." The concept of property, for capital gains tax purposes, is limited to those assets treated as capital assets. Therefore, plaintiff must show that the property donated was a capital asset as contemplated within the meaning of the Internal Revenue Code. To make this determination, we must look at the nature of the income that would have resulted had there been no assignment. If Bonnin had retained the contract, he would have received income for personal services. The question then is whether the assignment of the right to receive the income intervenes to alter the inherent characteristics of the income such as to remove it from the realm of ordinary income when it is ultimately received. We conclude that it does not. Courts many

**2.** L.O. 1118, 1923–2, Cum.Bull. 148:
"In view of the fact that no gain or loss is realized by a gift of property (article 141, Regulations 45), the question is presented as to whether Congress intended to tax indirectly the unrealized appreciation in value of property, the subject of a charitable gift, by not permitting a deduction therefore to the extent of the appreciation in value.

  *  *  *  *  *

"On account of the clear purpose of Congress in enacting the charitable contributions section and the express language used permitting a taxpayer to deduct charitable gifts to the amount of 15 percent of his net income, it is not considered that Congress intended to tax indirectly any unrealized appreciation in the value of property given to charitable

organizations by allowing as a deduction something less than the amount of the property given (subject to the 15 percent limitation), nor, in the opinion of this office, was it the intention of Congress to allow as a deduction any unrealized loss or decline in value where the property has decreased in value subsequent to its acquisition."

**3.** "§ 117. Capital gains and losses—(a) Definitions. As used in this chapter—(1) Capital assets.
"The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—* * *." 26 U.S.C. § 117 (1952 Ed.) [Exceptions not important here.]

times have had occasion to pass on the question of whether future income may be converted into capital gain. The decisions amply support the position that what was income to the assignor remains income when it is received by the assignee. Arnfeld v. United States, supra; Cotlow v. Commissioner, supra.

The rationale supporting our decision is that if the fee were paid to Bonnin it would be taxable to him as ordinary income and that no transaction could change the character of the fee. Were we to hold otherwise, we can visualize countless opportunities for individuals performing personal services to exploit this method of limiting their tax responsibilities. For example, two lawyers, each working on a contingent fee contract, might sell to the other the right to receive payment under their contract for a nominal sum. They would then aver that the gain realized was a capital gain because it represented gain on the sale or exchange of property. True, it is not the function of courts to legislate in an effort to close tax loopholes, but certainly it is not the function of courts to create the loopholes which is what we would be doing if we acceded to taxpayer's contention.

In Arnfeld, supra, this court reviewed the authorities on this question. We feel no useful purpose would be served by restating the principles therein discussed. We affirm our decision in that case and hold that the amount received by taxpayer in excess of his cost is taxable as ordinary income to him. To do otherwise would overlook the actual and practical occurrences of this particular instance. Plaintiff purchased this contract right in 1938, and Bonnin died in 1942. Bonnin was not a lawyer, even though he had a legal right to share in the fees. The fees were paid in 1951. The point is that the accretion in the value of the contract right was due mainly as the result of taxpayer's own efforts and performance of his personal services. This being true, we are of the opinion that the provisions of section 107(a) should apply to limit taxpayer's liability by computing the tax as if the income had been received from the time the contract right was purchased until the date of actual receipt. Since the gain is taxable as ordinary income, it does not qualify as "property" within the meaning of section 117 of the Code, nor as "property" as determined by judicial review in interpreting Treasury regulations. Therefore, the amount of gain realized must be attributable to earned income. It should be noted that this determination increases taxpayer's adjusted gross income which, in turn, increases the amount of the charitable deduction to the extent of 15 percent of the new figure.

Defendant is entitled to recover on its counterclaim only to the extent set forth in this opinion.

The third issue is whether the taxpayer is entitled to treat the gain from the sale of a contract right as a capital gain. Defendant raises this issue by way of answer in setoff.

On May 15, 1950, plaintiff purchased one-third of the remaining Bonnin interest in the fee discussed above from Bonnin's widow. On October 1, 1951, plaintiff sold this right at a profit. He reported this profit on his 1951 income tax return as a long term capital gain. The defendant avers that this gain is taxable as ordinary income to the plaintiff.

The facts involved in this issue are even more favorable to the position taken by the defendant as discussed in the second issue. Therefore, we are of the opinion that the reasons set forth at length in the second issue adequately dispose of this question. For the reasons stated above, we hold that the gain to the taxpayer is income to him and, therefore, it is taxable as ordinary income to him. Consequently, defendant's answer in setoff is well taken.

The plaintiff raises the question of estoppel claiming that he relied on the advice of the defendant's agents. We believe this contention is without merit. Inasmuch as we have held that plaintiff

is entitled to recover on the first issue, there is no need to discuss plaintiff's reliance on the advice of the Government's agent as to that issue. The plaintiff contends, however, that the gift was made in reliance on the agent's advice that the gift was a gift of property and, as such, would not be includible in taxpayer's income. Courts have uniformly held that the taxpayers cannot rely with impunity on representations or statements of Revenue agents. Restating this principle, the assertions or representations of a Revenue agent, pertaining to a question of law, are not binding upon the United States. Darling v. Commissioner, 4 Cir., 49 F.2d 111, cert. denied, 283 U.S. 866, 51 S.Ct. 657, 75 L.Ed. 1407; Martin's Auto Trimming, Inc. v. Riddell, 9 Cir., 283 F.2d 503; Agricultural Securities Corp. v. Commissioner, 39 B.T.A. 1103, affirmed, 9 Cir., 116 F.2d 800.

The refund of tax deficiency here sought by the plaintiff in the petition is granted, the recovery sought by defendant in its counterclaim is granted to the extent set forth above, and judgment will be entered to that effect. The amounts of recovery, on the claim and counterclaim, will be determined pursuant to Rule 38(c), 28 U.S.C., taking into consideration the effect of the answer in setoff.

It is so ordered.

DURFEE, Judge, concurs.

DAVIS, Judge, took no part in the consideration and decision of this case.

JONES, Chief Judge (dissenting in part).

I think plaintiff should recover on the first issue, but on a different basis from that set out in the majority opinion.

▇ Section 107(a) of the Internal Revenue Code of 1939, quoted in the opinion, permits moneys physically collected during one year, but actually earned through personal services performed during three or more years to be treated—for the purpose of placing a limit on the total income taxes which the recipient would be required to pay on such collection—as if collected ratably in each of the years during which the work was performed. It was a relief measure.[4] Adjustments were to be made so that for tax purposes the results were to be the same as if the work had been performed and paid for during each of those years. The aggregate tax levies for 1951 were thus given a maximum limit.

Section 23 of the 1939 Code limits the deductions for charitable and other similar purposes to 15 percent of the *adjusted* gross income.

The two sections should be construed together. The deduction section and the tax section are as intimately linked as the law of demand and supply. Without the tax section the limitation on the deduction would be meaningless. The deduction section follows and should be construed with the taxing section. Since the money is to be treated—for the purpose of measuring the ultimate tax—as if collected ratably during each of the 17 years, the deduction should be allotted in exactly the same way.

I would allow the charitable deduction to be treated as if made ratably during each of the years the tax has been treated as collected. The limitation of 15 percent should be treated as applied to the additional sums that were later treated as collected during each of those years. It seems illogical to treat sums collected in one year as if actually collected in other years for one purpose and as not collected during those other years for other purposes relating to the same subject, especially where the limitation of one is yoked directly to the other. It was an artificial method of reducing the tax levy on funds all of which were received in one year (1951) and all of

---

4. The Senate Finance Committee Report filed in connection with the enactment of section 107 clearly shows that it was intended as a relief measure in hardship cases (S.Report No. 648, 76th Cong., 1st Sess., p. 7).

which were taxed in and for 1951. The funds were not spread back. The taxes were not spread back. The taxes were merely calculated as if spread back.

Certain other sums were no doubt collected and deductions made during the earlier years. The additional deductions of 15 percent for each of the 17 years would apply only to the extra amount that was added for tax limitation purposes to the adjusted gross income for each of those years. Plaintiff has, no doubt, taken his charitable deductions for sums actually collected during those years. But he has not been given any charitable deduction for that portion of the adjusted income physically received in 1951 which was treated for tax purposes as if it had been collected during those previous years. Yet the statute gives him that right. To illustrate. For simplicity let us assume that the total net income for 1951 was $100,000 for a 5-year period, that the money was earned over a 5-year period, the tax rate remaining the same for the entire period. This would be taxed under the regular tax statutes except for the fact that section 107 permits the taxpayer a top limit on the total taxes to be collected.

I would treat the issue for tax purposes as if $20,000 had been earned ratably in each of the 5 years. I would then calculate the tax on the $17,000 net after making the ratable gift deduction of $3,000 for each of the 5 years.

It will also be noted that section 107, even if given a technical interpretation, does not say that the tax shall be levied anew for each of the 17 years. It merely places an over-all limitation on the amount of the taxes collected by stating that the aggregate of taxes paid shall not exceed the amount which would have been due and payable "had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual." It is a relief section. It does not actually carry the taxes back to those years. That would involve the assessment of penalties. It merely places a ceiling on the total taxes to be paid on the sums actually received in one year by saying in effect that the aggregate of the taxes paid on such sums shall not exceed the aggregate which would have been paid ratably during those years. The tax is not actually levied on each of the previous years. It is not even collected for each of those years. The language used is merely a measuring device for limiting the taxes to be paid, in this instance on sums collected in 1951, to a top limit of what they would have been had they been collected ratably over the previous years.

However, in order that a decision may be reached in this case, I concur with the conclusion of the majority on the first issue.

As to the counterclaim or setoff, I am inclined to the opinion that plaintiff should not be taxed on the 44.79 percent of the Bonnin interest. This was purchased in 1938 when there was no assurance there would ever be a recovery, nor what even the approximate amount might be. It seems this should be treated as an inchoate property interest. If treated as a sale it should be classed as capital gain. It was given away for educational purposes, and should not be taxed, assuming of course that it is within the 15 percent permitted as a deduction.

As to the proceeds of the one-third of the remaining 55.21 percent of the Bonnin interest which was purchased in 1950, the same year a negotiated settlemen had been agreed upon between the parties and judgment recommended, and the same year the agreed settlement was approved by the court, it seems that the principles set out in Arnfeld v. United States, 143 Ct.Cl. 277, 287, 163 F.Supp. 865, and the cases therein cited, should be applied. At that time recovery and the amounts had become reasonably certain. That part should be treated as income and the tax thereon should be allowed as a setoff against any amount which plaintiff is otherwise entitled to recover.

REED, Justice (Retired) sitting by designation (concurring in part and dissenting in part).

I agree with Judge WHITAKER'S dissent as to the first issue discussed in his opinion. Section 107 of the 1939 Code in effect makes available an alternative method of computing the tax to those who satisfy its conditions. It merely provides that the tax may be computed *as if* the fee had been received ratably over the years; if the fee had in fact been so received, plaintiff's charitable deduction for the year 1951 would have been limited to 15% of his adjusted gross income which would have been that portion of the fee allocable to 1951 plus other 1951 income less the deductions provided by section 22(n) of the Code. The Tax Court would reach this result. Cf. Thayer v. Commissioner, 12 T.C. 795. Furthermore, Section 23(o) of the 1939 Code, providing for deduction of charitable contributions, contains no provision for ratable distribution of the amounts given eligible donees. Congress provided for ratable allocation of only receipts in section 107. The time of gifts was left in the control of the donor; here all the gifts were made in 1951 and are deductible only in that year.

As to the issues of defendant's counterclaim and setoff, I disagree with Judge WHITAKER'S conclusion. The purchase of the interests of Capt. Bonnin, and later those of his widow, appear to me to be in the nature of ordinary business transactions, one entered into for profit in 1938 and the other in 1950. The interest in the ultimate Ute fee purchased from Capt. Bonnin was assigned to the Church of Jesus Christ of Latter-day Saints and Brigham Young University, September 27, 1951. Finding No. 34. The interest in the ultimate fee purchased from Mrs. Bonnin was sold to a private buyer for a profit on October 1, 1951. Findings No. 20 and No. 38. This court fixed the fee on November 6, 1951. Finding No. 39. While there was no certainty as to the amount of the fee when these gifts were made, the judgment in the case had been entered and the court was engaged in determining the exact percentage of the judgment that would be allowed as a fee. It was only a matter of days. Had Wilkinson collected the amounts himself, he would have received ordinary income since no "sale or exchange" would have taken place. See § 117(a) (4), 1939 Code; Ogilvie v. Commissioner, 216 F.2d 748 (C.A.6). Anticipatory assignment of the right to receive the sums should not change the result.

■■ I conclude that the amounts ultimately received by the Church and the University reduced by the cost to the Wilkinsons should be taxed as ordinary income to the plaintiffs; and that the sale of the share of Mrs. Bonnin should be treated the same way. See Doyle v. Commissioner, 147 F.2d 769 (C.A.4); cf. Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75.

Thus, I dissent from the majority's conclusion on the first issue and concur in the result on other issues.

WHITAKER, Judge (dissenting).

I regret to disagree with Judge LARAMORE'S opinion with reference to the basis for the computation of the deduction for the charitable contribution in 1951. I think he has misinterpreted the applicable statutes.

Ordinarily a lawyer on a cash basis includes in his income tax return all fees received within the year. From this, in order to arrive at his "adjusted gross income", as defined in section 22(n) of the 1939 Internal Revenue Code, he deducts his "trade and business deductions", his "deductions attributable to rents and royalties", "losses from sales or exchange of property", and, in some cases, other items. The result is his "adjusted gross income."

To arrive at his net income, the lawyer deducts various things set out in section 23, among which are "charitable and other contributions" up to an amount not in excess of 15 percent of his "adjusted gross income." Then he deducts certain exemptions and computes his tax on the balance.

This taxpayer received a fee in 1951 of $1,266,625.20. This he included in

his gross income. In that year he made contributions of $203,243.48, but, since this exceeded 15 percent of his adjusted gross income, he only deducted $189,993.78.

So computed, his tax amounted to a certain figure. But section 107 of the Code says that he does not have to pay this much, since the fee was earned in a period of more than three years, if a lesser amount results from computing the tax for each year during which the services were rendered, including in the gross income for each year a ratable part of the fee received, and taking the deductions and exemptions permitted by the law applicable to each year. If the aggregate is less than the tax as normally computed, he is required to pay only the lesser amount.

In making the computation under section 107, the tax for each year is computed as if he had actually received in that year a ratable part of the total fee. This ratable part is included in his gross income. From this he takes his deductions, expenses, taxes, interest paid, losses and charitable contributions made during the year, to the extent allowable for the particular year. He does this for 1935, 1936, 1937, 1938, and so on up to and including 1951. For each year he deducts from his supposed income for that year the allowed items, including any charitable contributions made in that year. He does this for 1951. He computes his gross income for that year, as if he had received therein only a ratable part of the total fee; then he takes the deductions allowed to determine "adjusted gross income"; and then he deducts therefrom other items allowed, including a charitable deduction, up to 15 percent of this adjusted gross income.

But the aggregate of the taxes for each of these years is not his tax, necessarily; it is the tax he has to pay only if it is less than the tax normally computed.

It seems clear to me that when a taxpayer computes his tax under section 107, in order to ascertain his adjusted gross income, he includes in his gross income for each year only the ratable amount of the total compensation received, and then takes therefrom the allowable deductions. From the adjusted gross income, so arrived at, he deducts charitable contributions made for that year, up to 15 percent of his adjusted gross income, computed as prescribed in section 107, that is, by including in gross income only a ratable part of the fee received in that year.

Defendant's Counterclaim and Set-off

On August 13, 1957, defendant refunded to plaintiff an overpayment of income taxes in the principal amount of $85,721.93, which, together with interest, amounted to a total of $114,885.19. However, after plaintiff had filed his petition in this case, defendant on July 29, 1959, filed a counterclaim, which was amended on September 17, 1959, claiming that this refund was erroneous. The reason assigned therefor was that Wilkinson should have reported as income the difference between what he paid for an interest in Captain Bonnin's share of the fee in the Ute case and what he received therefor. (Captain Bonnin was originally employed by the Indians and associated plaintiff with him.)

What plaintiff was entitled to receive on account of Bonnin's share of the fee, he assigned, in September 1951, to the Brigham Young University and the Church of Jesus Christ of Latter-day Saints. This was paid to the assignees in December 1951. Plaintiff never received any part of it.

Plaintiff says no gain is realized from the appreciation in value of property when the property is given away. This has long been recognized; it has never been questioned. The Revenue Agent who examined plaintiff's returns recognized it. His report, quoted in the Trial Commissioner's finding 4, reads:

"No gain or loss is realized by a gift of property even though the gift is a charitable contribution for which a deduction is allowed of the fair market value of the property at the time of the contribution of the

gift. L.O. 1118, CB Dec. 1923, p. 148.

"If the contribution is other than money, the basis for calculation thereof is the fair market value of the property at the time of the contribution. Since there is no provision in the law which makes a charitable contribution of gift result in taxable gain or deductible loss any appreciation in value of the property is not taxable to the donor and any decrease in value is not deductible."

This report was approved by the Commissioner of Internal Revenue.

Defendant now says—contrary to the determination of the Commissioner of Internal Revenue—that what plaintiff gave the university and his church was his income and, therefore, the difference in what he paid for it and its value on the date of the gift should have been returned as income. This is an untenable position. Plaintiff realized no income from his purchase of Bonnin's interest in the fee, because he never sold or exchanged what he had bought, but gave it away. As the Revenue Agent said, "no gain or loss is realized by a gift of property." This has been the uniform holding of the Internal Revenue Service from the beginning of income tax era.

This was not a gift of income that had been earned by plaintiff; it was never plaintiff's income; it was Bonnin's income. Plaintiff became entitled to it by purchase, and not as compensation for his services.

Captain Bonnin, an ex-soldier of the United States Army in World War I, was a quarter-blood Sioux Indian. He had been chief clerk of the Uintah-Ouray Reservation in Utah. He had completed the law course at George Washington University, but did not get a degree and was never admitted to the Bar, but he was admitted to practice before the Department of the Interior. His wife was a full blood Sioux, highly educated, a fine orator, a graduate of the Boston Conservatory of Music, and a fine musician.

She was president of the National Council of Indians and Captain Bonnin was secretary-treasurer. The Indians had full confidence in Captain Bonnin.

In August 1932 Captain Bonnin entered into two contracts to represent the Uncompahgre Band of Ute Indians in Utah and the Uintah and White River Bands of Ute Indians in the prosecution of claims against the United States. These contracts had to be, and were, approved by the Secretary of the Interior. They were property rights and were the subject of assignment. Captain Bonnin did assign them to a New York law firm, but reserved in himself a certain interest in them. The contracts called for a fee not to exceed 10 percent of any amount recovered on the claims. Captain Bonnin had never been admitted to the Bar and was unable to represent the Indians in court, but, nevertheless, he was entitled to a certain part of any recovery that might be had, since it was he who had the contracts to represent the Indians. He did such work as he could on the case but practically all the work was done by the lawyers, but, even so, Captain Bonnin was entitled to his part of the fee.

Bonnin's assignment of the contract passed from the New York law firm to Wilkinson; new and other contracts were made, but Bonnin's interest survived. When the fee was finally paid, Bonnin's share was $427,000+, less the part of his fee which he had previously sold, although Bonnin had died in 1942. Although he rendered no service after that date, and but little before, and although the recovery was due primarily to the labors of others, Bonnin's share, arising out of his contract with the Indians, was the sum stated.

It can scarcely be doubted that Bonnin's interest in any fee to be recovered was property—and valuable property at that—and capable of assignment to charitable and like organizations.

In 1938 Bonnin had to raise some money. He approached plaintiff to induce him to purchase an interest in his share of the fee. Plaintiff finally pur-

chased a 44.79 percent interest in it for the sum of $12,000+. This left Bonnin with a 55.21 percent interest. After Bonnin's death, his widow became entitled to a one-third interest in this 55.21 percent. Plaintiff, at her request, bought her interest for $16,000+. This he later sold to William F. Edwards for $72,916.50.

When plaintiff collected the fee awarded by the court, for himself and as trustee for others entitled to shares in it, he paid Bonnin's share of $427,245.53 to John K. Edmunds, as trustee or attorney-in-fact, for distribution to the assignees and to Bonnin's heirs. Edmunds distributed the amount as follows:

To Church of Jesus Christ
  of Latter-day Saints .....$124,386.13
To Brigham Young
  University .............. 66,977.15
To William F. Edwards ..... 78,627.42

The balance of $157,254.83 he held for the benefit of the heirs of Captain Bonnin.

Had Bonnin lived and had not sold a part of his share of the fee, he would have received the full $427,245.53, although most of the work that produced the fee was done by Wilkinson. Therefore, what Wilkinson got out of the Bonnin share was not as compensation for *his* services, but as a result of his purchase of an interest in the compensation to which Bonnin was entitled. If he had not purchased an interest in it, he would have gotten no part of it. Hence, plaintiff would have realized no income until there was a sale of what he had purchased. Since he never sold it, it was never plaintiff's income, and was properly excluded from his gross income.

Since this income was Bonnin's income, and not Wilkinson's, the cases cited by defendant are not in point.

Defendant does not dispute plaintiff is entitled to a deduction of the market value of the charitable contribution up to 15 percent of his adjusted gross income.

Plaintiff's purchase and sale of the interest in the Bonnin fee he purchased from Bonnin's widow was a capital transaction, and was so treated by plaintiff in his return.

I am of opinion that plaintiff's petition and defendant's counterclaim should be dismissed.