Jacqueline JAMISON, etc. and Wells Fargo Bank, etc., Plaintiffs,

v.

UNITED STATES of America, Defendant.

John E. GORDON and Vivian F. Gordon, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 42785.

United States District Court
N. D. California.

Dec. 12, 1968.

Weir, Hopkins, Donovan & Zavlaris, San Jose, Cal., for plaintiffs.

John Youngquist and Richard Carico, Asst. U. S. Attys., San Francisco, Cal., for defendant.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

These are consolidated actions in which plaintiffs seek refunds of sums paid to the United States for federal income taxes. The parties have agreed and stipulated to submission of the actions for decision, pursuant to Rule 9 of the Court's Rules of Civil Practice, upon an agreed statement of facts, briefs and oral argument. (Stipulation filed July 31, 1967).

Plaintiffs' claims for refunds are based upon their contention that certain payments of money received by them in the years in question were entitled to capital gains taxation under the Internal Revenue Code of 1954. The United States contends that the subject payments of money received by the taxpayers were not entitled to capital gains treatment under any provision of the Code and it consequently taxed the payments at ordinary income rates.

The controversy arises from the use of certain standardized Water Main Extension Contracts between California water utilities and real estate developers. These contracts are used when a real estate developer applies to a local water utility for the extension of water mains to a new subdivision. An estimate of

construction costs is made and the developer agrees to advance such sum (adjusted ultimately for actual cost) to the utility, either before construction or periodically during construction of the new main. The utility then constructs the main, paying for it with the developer's "advance", and the utility acquires title to and owns all of the facilities thus constructed. The utility agrees to "refund" to the developer over a specified period of years and in periodic payments, a specified percentage of the revenue it receives from charges to water consumers supplied through the new main. The agreements uniformly provide that the total periodic payments to be made shall not exceed the total actual construction costs advanced to the utility by the developer; that no interest is payable on the construction costs advanced, and that, in the event an agreed period of years expires prior to full repayment of the construction costs to the developer, the utility has no obligation to make further payments. (Agreed Statement, para. 5 and Exhibits thereto).

It is clear that the primary function of the contracts is to provide the utility with immediate funds for adding new extension facilities to its own plant for the purpose of supplying water to new real estate subdivisions. The risk and financial burden are placed upon the developer rather than upon the utility. In return for this, the utility promises to repay those funds only if and when the new facilities begin to "pay off" through sales of water to new users in the development. Because of risks inherent in developing new subdivisions these contracts are used to avoid the necessity for the utility to increase its capital investment or its fixed indebtedness (e. g. bonds, debentures or notes) to finance a water main extension into a new area.

The utility "pays" for the new extension "as it goes"; i. e., as revenue is produced from water sold through the completed facilities—a generally satisfactory solution to the problem of risk-bearing for all parties concerned: developer, utility and consumers.

The plaintiffs here are not the developers who were the original parties to the contracts with the utilities.

The plaintiffs purchased the developers' rights under the contracts and received written assignments. (Agreed Statement, para. 4 and Exhibits). The purchase prices which they paid to the original developers represented discounts of from 40 to 60 per cent of the "face values" of the costs paid by the developer under the particular contract and thus the maximum total payments which the utility might make during the contract period. (Agreed Statement, para. 7 and Exhibits A and B.) In respect of each of the contracts in issue in these cases, the plaintiffs received total payments from the utilities exceeding what they had paid to the developers for the contract rights. (Agreed Statement Exhibits A and B). The proper income tax treatment of this excess is the issue in this case.

The basic requirement for capital gain or loss treatment is that the transaction giving rise to the claimed gain or loss must constitute a "sale or exchange of a capital asset", 26 U.S.C. §§ 1221, 1222. Since plaintiffs have not sold or exchanged the contracts, there could be no capital gain or loss in the absence of some special statute.

Plaintiffs contend that Internal Revenue Code, 1954, Title 26 U.S.C. § 1232(a), is such a statute. It provides that "in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor."

Plaintiffs contend:

(1) That the contractual rights, which they acquired by purchase and assignment, constitute "capital assets" in their hands within the meaning of Section

1232 and within the meaning of Section 1221.

(2) That their contracts, although not bonds or debentures, constitute "other evidences of indebtedness" within the meaning of Section 1232(a).

(3) That the payments received by them under their contracts (in excess of what they paid for the contracts) constitute amounts received "on retirement of such * * * evidences of indebtedness" within the meaning of Section 1232(a).

Plaintiffs conclude that under Section 1232(a), the amounts received by them in excess of what they paid for their contracts must be considered as in exchange therefor, and treated accordingly, not as ordinary income, but as capital gain.

The government, disputing all three of these points, contends that the amounts received by plaintiffs (in excess of what plaintiffs paid for their contracts) do not fall within Section 1232(a) and that such amounts are, therefore, taxable as ordinary income.

## CAPITAL ASSET

Taking up first the question, i. e., whether these contracts held by plaintiffs constitute capital assets in their hands within the meaning of Section 1232(a), the term capital asset is defined in Section 1221 as "property held by the taxpayer (whether or not connected with his trade or business), but does not include * * *" five categories of property set forth in the section. These exclusions, however, are rendered inapplicable in the pending case because the Agreed Statement of Facts concedes (Par. 8) that the contracts do not fall within any of these exclusions.

For the purposes of this case, therefore, the contracts must be regarded as property held by the plaintiffs, not in the course of a trade or business, but for investment purposes. Prima facie, therefore, these water contracts in their hands were capital assets as defined in Section 1221.

It has been said, however, in our Ninth Circuit, Hallcraft Homes, Inc. v. Commissioner of Internal Revenue, 336 F.2d 701, 703 (1964) that water extension contracts like those here involved, do not constitute a "capital asset" within the meaning of Section 1221, *in the hands of the original developer* and that a lump sum received by him upon assignment of his contractual rights at a discount must be treated as ordinary income rather than capital gain. The Court based this holding upon the ground that the substance of what the developer assigned was the right to receive future ordinary income and that the substance of what he received was the present value of the ordinary income which he would otherwise have received in the future.

Defendant here, relying on Wilkinson v. United States, 304 F.2d 469, 473–474, 157 Ct.Cl. 847 (1962) contends that, since these contracts did not constitute capital assets in the hands of the original developer as held in *Hallcraft*, they cannot be treated as capital assets in the hands of plaintiffs as assignees of the contracts.

In *Wilkinson* the Court considered the question whether the assignment of the right to receive income (amounts payable under a contract for personal services) intervenes to alter the inherent characteristics of the income so as to remove it from the realm of ordinary income when ultimately received. The Court held that what was income to the assignor remains income when received by the assignee, citing Cotlow v. Commissioner of Internal Revenue, 22 T.C. 1019 (1954) (affirmed 228 F.2d 186, 2d Cir. 1955) (involving similar assignment of rights to receive future insurance commissions [clearly income] and that the contract in the hands of the assignee, although "property" did not constitute a "capital asset" within the meaning of Section 1221.) See also, Grinnell v. United States, 390 F.2d 932, 949, 182 Ct.Cl. 702 (1968).

Plaintiffs, however, contend that the real rationale of *Hallcraft* was, not that the water contracts as such did not con-

stitute a "capital asset" in the hands of the developer, but that (as is clear from the Tax Court decision in the case, 40 T.C. 199, and as is also inferable from the Court of Appeals opinion), the developer, having already allocated his advances to the cost of his lots to be treated as a cost deduction on sale of the lots, could not also expect capital gain treatment for a recoupment (through assignment) of a portion of those advances. The developer there (apparently for this reason) conceded that he had in fact taken tax deductions for his advances to the utility and that, therefore, payments from the utility to him under the water contracts were reportable by him as ordinary income.

This was the only reason, plaintiffs argue, why the Court considered the developer's recoupment of his advances as falling with such "assignment of income" cases as Hort v. Comm'r of Internal Revenue, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941); Comm'r of Internal Revenue v. Lake, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958) and Holt v. Comm'r of Internal Revenue, 303 F.2d 687 (9th Cir. 1962)—all standing for the proposition that amounts received by a taxpayer in exchange for his contractual right to receive future payments, *which would normally constitute ordinary income to him, must be* treated as ordinary income even though, as stated in *Hort,* the contract creating the right could be treated for some purposes as property or capital.

We are of the opinion that plaintiffs have properly construed *Hallcraft.* To construe that case otherwise would reduce the holding of the case to absurdity because, *if* the developer in *Hallcraft* had *not* allocated his advances to the cost of the lots, there could have been no justification whatever for regarding repayment of these advances as ordinary income to him. If he had not so allocated his advances and had retained the contracts, receiving back ultimately from the utility the whole amount of his advances, such receipts would certainly not have been "ordinary income" to him any

more than a repayment of an advance or loan to a friend would have been income to him. Obviously, such receipts would have been, not income at all, but clearly and solely a return of his actual advance to the utility—a return of his capital funds, no more, no less.

Although a developer can charge advances of this kind to the cost of his lots for tax purposes, he is not obliged to do so. In fact, the government has in the past argued that advances of this kind are not properly allocable as costs of the subdivision to be recouped as such for tax purposes. Herzog Building Corp. v. Comm'r of Internal Revenue, 44 T.C. 694 (1965) was a case where it was held the developer could so allocate his advances for tax purposes. There is nothing in the case, however, to support defendant's contention that the law *requires* the developer to do so. He can, if he so chooses, treat the utility contract as a capital asset in his hands and sell or exchange it in an investment market.

So, if the developer in *Hallcraft* had assigned his contract at discount (without having previously allocated the advances to cost of the lots) the amount he received for the assignment could not have been held upon any theory to have been "the present value of the ordinary income he would otherwise have received in the future." On the contrary, he would obviously have been receiving only the present value of the return of capital he would otherwise have received in the future.

For these reasons we conclude that, in order to render the holding of *Hallcraft* understandable, we must regard it as having been based on the fact that the developer there had allocated his advances to cost of lots to be recouped as expense on sale of the lots and had thereby lost his right to further claim payments to him under the contract as return of capital.

Only in this sense could the court have meant that the water contracts did not constitute "capital assets" in the developer's hands.

It is stipulated that, although the original developer in the pending case had, in fact, allocated his advance to cost of his lots, just as in *Hallcraft*, the plaintiffs here bought the water extension contracts at discount from the developer (in an investment market which had been created for contracts of this kind) without any knowledge or means of knowing that such was the fact.

We must, therefore, regard plaintiffs here as having bought at discount and as having invested in water extension contracts obliging the utility to make, upon certain conditions, what appeared to be payments to the developer which would be, so far as plaintiffs could see, not ordinary income, but merely a return of the developer's capital. It is true that the courts have held that not all "property" outside the statutory exclusion of Section 1221 qualifies as a capital asset; that the term is to be narrowly construed in accordance with the purpose of Congress to afford capital gain treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time and thus ameliorate the hardship of taxation of the entire gain in one year. Commissioner of Internal Revenue v. Gillette Motor Co., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960); Roth v. Comm'r of Internal Revenue, 321 F.2d 607, 609 (9th Cir. 1963).

These cases cite such cases as Hort v. Commissioner of Internal Revenue, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941); Corn Products v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955) and Commissioner of Internal Revenue v. Lake, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958), as examples of property which, although literally "capital assets" have, nevertheless, been held, not to be such for capital gain purposes.

In Hort v. Commissioner of Internal Revenue, *supra,* holding that payments received from a lessee by a landlord in cancellation of the lease were not entitled to capital gain treatment, the ground of the decision was that the payment was in lieu of future *rent* which obviously would have constituted ordinary income to the lessor.

In Commissioner of Internal Revenue v. Lake, 356 U.S. 260, 266–267, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958) the ground of decision was that payments made to a person for his oil royalties should be treated as ordinary income to him because the payment was in lieu of royalties which, if he had retained his interest, would obviously have constituted ordinary income to him.

In our pending case, however, we have no such situation. The payments by the utility under the water contract were not in the nature of ordinary income, e. g., rents (as in Hort, supra) or oil royalties (as in Lake, supra), or insurance commissions (as in Cotlow, supra) or for personal services (as in Wilkinson, supra). They were solely a return to the developer of his capital advance to the utility and, if it had not been for the developer's recoupment of this capital advance by treating it as part of the subdivision cost for tax purposes, there would have been no reason for considering these payments otherwise—even in the developer's hands. Further, the water contracts called for the return *only* of the developer's capital advance without interest or other increment to him which could have been income to him.

The rule of the "assignment of income" cases, therefore, does not apply to our situation and, since it is stipulated that plaintiffs bought these contracts to hold as investments, we can see no reason for saying that the contracts do not constitute capital assets in their hands.

We conclude, therefore, that the real question in this case is, not whether these water contracts were capital assets in the hands of plaintiffs, but whether these contracts meet the further requirement of Section 1232(a) that they must be "evidence of indebtedness" within the meaning of the section before amounts received in retirement thereof can be considered as in exchange therefor and as such entitled to capital gain treatment.

## OTHER EVIDENCE OF INDEBTEDNESS

Debt is defined as "an unconditional promise to pay a fixed sum at a specified date * * *. The word 'debt' carries with it the requirement of certainty * * * 'Obligation' is a broader term than 'debt' * * *. *Every obligation is not a debt, though every debt is an obligation.*"

Obligation is defined as "a generic word, * * * having many wide and varied meanings, according to the context in which it is used * * *. That which a person is bound to do or forbear; any duty imposed by law, promise, contract. * * *" Black's Law Dictionary (4th ed.).

In Gilbert v. Comm'r of Internal Revenue, 248 F.2d 399 (2d Cir. 1957) the Court said that although for the purpose of federal tax statutes, debt in the classic sense is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack of it, "some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes."

Plaintiffs, contending that these water contracts are evidence of debt within the meaning of Section 1232, argue that the indebtedness referred to in the section is used in the broader sense of obligation, pointing out that the regulation under Section 1232, i. e., Treas. Reg. 1.1232–1 provides that Section 1232 applies to any bond, debenture, note or certificate or other evidence of indebtedness referred to in this Section and Sections 1.1232–2 through 1.1232–4 as an *obligation* * * * and that "In general, Section 1232(a) provides that the retirement of an *obligation* * * * is considered to be an exchange and, therefore, is usually subject to capital gain or loss treatment." (emphasis added).

Plaintiffs further point out that the word "obligation" also appears in 26 U.S.C. § 103, providing that interest on "obligations" of governmental agencies is tax exempt, and also that the regulation under that section, i. e., Treas. Reg. 1.103–1, provides that "obligations" are within the tax exempt provisions of Section 103 even where the principal payments are payable out of a special fund. Plaintiffs also cite Revenue Ruling 58–452, 1958–2 Cum.Bull. 37 to the effect that revenue bonds payable solely from revenues derived from the operation of a water works fall within the tax exempt interest provision of Section 103.

Defendant contends that, although the water service contracts here involved unquestionably represent obligations of the utilities, they are not evidence of indebtedness within the meaning of Section 1232(a) because they are payable only from a special source, i. e., a stated percentage of such service revenues as are received during semi-annual periods by the utility from subdivision customers.

In the course of oral argument this contention has been considerably narrowed in that defendant places his reliance, not upon the provision of the contract that payment under it is contingent on the receipt of such service revenue, but upon another provision of the contract to the effect that, if payments under it have not fully repaid the developer's advances within a given number of years, the obligation of the utility to make further payments is extinguished.

Defendant also points out that the utility is obliged to repay only the principal advance without any interest or other increment to the developer.

Defendant also argues that these water contracts should not be held to evidence debt because it is the policy of the California Public Utilities Commission to have water utilities enter into these contracts for the very purpose of avoiding debt, i. e., the use of its borrowing power; for extending service to new, risky, unimproved subdivisions and to place the initial cost of the service extensions on the developer. See, P. U. C. Case No. 5501, Decision 64536. This is true in the sense that the utility thereby

avoids general, unconditional indebtedness. The utility, nevertheless, does promise to repay the developer the amount of his advance upon the contingency already discussed.

Cases dealing with the "other evidence of indebtedness" provision of Section 1232(a) (Revenue Act of 1954) and its similar predecessor statute, Section 117 (f), Revenue Act of 1934, have come to various conclusions.

In Timken v. Commissioner of Internal Revenue, 6 T.C. 483 (1946) the Tax Court, dealing with taxpayers claimed capital gain on non-interest bearing "creditors notes" issued to depositors in a failed bank, held them, citing *Rieger, infra,* to be a capital asset in the hands of the taxpayer and also to be "evidence of indebtedness" within the meaning of predecessor Section 117(f), 1934 Act.

In Avery v. Commissioner of Internal Revenue 13 T.C. 351 (1949) it was held that certain cemetery certificates were evidence of debt within the meaning of the predecessor statute even though the amount and time payable were uncertain.

In Commissioner of Internal Revenue v. Caulkins, 144 F.2d 482 (6th Cir. 1944) the taxpayer had a contract with an investors' syndicate whereby, in consideration of payments of $15,000 over a period of ten years, the syndicate agreed to pay $20,000 and did. Both the Tax Court (1 T.C. 656) and the Court of Appeals held that, the increment to the taxpayer —the difference between the amount paid in and the amount received—was not income, but capital gain and entitled to treatment as such under the provisions of the predecessor statute, Section 117 (f), 1934 Act, rejecting the argument that the increment should be considered to be in the nature of interest paid by the syndicate for the use of the money.

On the other hand, in In re Woodpine Corp. P-H Memo, Tax Court, §§ 63, 262, September 26, 1963, the Tax Court, dealing with the taxpayer's contention that a court award of compensation for the condemnation of his realty by the City of New York for school and recreational purposes constituted a "sale or exchange" of the property because the amount awarded was in retirement of an "evidence of indebtedness" within the meaning of Section 1232(a), held that the obligation of the city to pay just compensation for the taking did not constitute a bond, debenture, note, certificate or other evidence of indebtedness within the meaning of the section because the amount of the award was not "similar" to corporate bonds and, therefore, clearly not the type of public indebtedness contemplated by Congress and, further, because the award was not created pursuant to the exercise of the borrowing power of the city.

In Gerard v. Commissioner of Internal Revenue, 40 B.T.A. 64 (1939) it was held that, a bond and mortgage given by a corporation to secure a loan from an individual was not an evidence of debt within the meaning of the predecessor statute, Sec. 117(f), 1934 Act, because, among other reasons, the bond and mortgage, in the form and under the circumstances, as given, was not included in the term bonds, debentures, notes or certificates, or other evidences of indebtedness specified in the section, under the old and well established doctrine of noscitur a sociis, adding: "Obviously, Congress, by the use of the word 'other' intended to limit the scope of the term 'evidences of indebtedness'," citing *Cobbs, infra.*

In Cobbs v. Comm'r of Internal Revenue, 39 B.T.A. 642 (1939) it was held that a combined life insurance and annuity contract, surrendered for the face amount, was not evidence of debt within the meaning of the predecessor statute, Section 117(f), 1934 Act, because the section excludes such contracts and is limited by the doctrine of noscitur a sociis to the bonds, debentures, notes, etc., specified in the context.

In Rieger v. Commissioner of Internal Revenue, 139 F.2d 618 (6th Cir. 1943), a receiver of an insolvent bank had issued to its depositors certificates of proof of claim evidencing the amount of their deposits. Just as in the pending case, plaintiffs had purchased from depositors

some of these certificates at discount and, having made a profit on the investment, reported the profit as a capital gain. The Commissioner and the Court of Tax Appeals had held that this profit should be taxed as ordinary income because the certificates did not fall within the predecessor statute (Section 117(f), 1934 Act.) The Court of Appeals reversed, saying, "[T]here can be no doubt that the taxpayers intended to, and actually did, invest portions of their capital assets in corporate certificates of indebtedness for speculative purposes" and holding that the certificates were certificates of indebtedness within the meaning of the statute.

The *Rieger* case is quite similar to the situation in the pending case except that in the pending case the promise of the water utility is not wholly unconditional, as in *Rieger,* but contingent.

In Ellis v. Commissioner of Internal Revenue, 3 T.C. 106 (1944) the court, dealing with certain "conditional rights certificates" issued by a corporation to holders of its convertible-participation stock, and obligating it to pay a certain sum per convertible-participation *share if* any dividend should be declared and set aside on its common stock, held that these certificates, being conditional only, were not certificates of "indebtedness" within the meaning of the predecessor statute Section 117(f), 1934 Act, unless and until the board of directors should declare a dividend on the common stock. A concurring opinion expressed the view that upon the happening of the condition such certificates "became to all intents and purposes certificates of indebtedness from that time on."

We believe that this case law tends to support plaintiff's construction of Section 1232(a) and that such construction is borne out by a consideration of the history and purpose of the legislation.

Prior to the 1934 Act it had been the law that, although profit on the call and redemption of corporate *stock* (equity securities) could be treated as capital gain, profit on the call and redemption of corporate bonds or debentures (debt securities) had to be treated, according to the then regulations as a straight gain.

During hearings of the House Committee on Ways and Means held during 1927 and again during 1933–4, the point was made that there is virtually no difference between these two "almost identical" transactions, that different treatment under the law was creating a queer situation; that the Board of Tax Appeals was reaching conflicting conclusions, (e. g., Werner v. Commissioner of Internal Revenue, 15 B.T.A. 482 (1929), held that profit on call for redemption of corporate bonds was made on a "sale or exchange" of the bonds and, therefore, entitled to capital gain treatment, but Watson v. Commissioner of Internal Revenue, 27 B.T.A. 463 (1932) held just the opposite); that Congress could not have intended to deny the benefit of capital gain treatment to gains (or losses) arising from the retirement of such capital assets, especially when such gain (or loss), if it had been realized on a true "sale or exchange" immediately before retirement, would have been clearly a capital gain (or loss).

In 1934 a new section, Section 117(f), was added making clear that amounts received by the holder on *retirement* of bonds, debentures, notes or certificates or other evidence of indebtedness, which are capital assets in the hands of the taxpayer, shall be considered as amounts received "in exchange," and thus entitled to capital gain treatment provided they were "with interest coupons or in registered form."

The Report of the House Committee on Ways and Means, accompanying the 1934 bill, simply said that Section 117(f) was intended to provide that amounts received upon the retirement of corporate bonds "and similar evidence of indebtedness" shall be considered as amounts received in exchange therefor.

In 1954 this Section 117(f) became Section 1232(a) of the 1954 Act with the significant change, however,

that the earlier formal requirement for interest coupons or registration was eliminated—evidencing an intent of the Congress to broaden the kind of corporate or public indebtedness that would be entitled to the benefit of the new section.

The government concedes that the purpose of the legislation was "simply a clarification of the law to cover the limited situation of redemptions or retirements of corporate *debt* securities (i. e., bonds, debentures, etc.) to put them *on equal footing with corporate equity securities*" (i. e., stock). (Def.'s Supp. Brief of 10/4/68, p. 11).

The question arises: If the purpose of the legislation was to put corporate or public *debt* securities, i. e., bonds, debentures and "other evidence of indebtedness," on a par in this respect with corporate or public *equity* securities, i. e., *stock* (which never involves an absolute, unconditional promise to pay money but is always contingent on a decision to declare dividends out of earnings, if any), why should we ascribe to Congress an intent to use the word indebtedness in such a narrow sense as would exclude corporate non-equity, i. e., debt evidences simply because the payment thereof happens to be similarly contingent on receipt of certain revenues into a special fund.

It seems to this court that any such interpretation would be not only unnecessary to the Congressional purpose, but also inconsistent with and, indeed, obstructive of it.

Further, the promise to pay contained in these water contracts is *not* entirely conditional. It is absolute insofar as it obliges the utility to pay to the holder a stated percentage of service revenues as received by the utility during each semi-annual period—an obligation no more conditional than a corporate declaration of dividends if and when there are earnings from which to pay them.

Defendant recognizes that the water service contracts here involved are similar to conventional revenue bonds—at least in the respect that they oblige the utility to pay from revenues as received from a specified source and over a certain period of time. (See, Def.'s Brief of 10/4/68, p. 17). In fact, in Herzog v. Commissioner, 44 B.T.A. 694 (1965) contracts identical with those here involved, were called utility "Revenue Bonds." Being in substance and effect revenue bonds or revenue debentures, these contracts would have been entitled to capital gain treatment if plaintiffs, holding them as capital assets, had decided to actually sell or exchange them instead of awaiting retirement by the utility.

The interposition of Section 1232(a) is necessary only because plaintiffs, preferring to await retirement of the utility's obligation, did not actually sell or exchange them.

■ Defendant contends that the amounts received in retirement are not entitled to the benefit of Section 1232(a) because the so-called extinguishment clause of the contracts prevents them from being evidence of indebtedness within the meaning of the section. In our opinion there is no merit to this point. The so-called extinguishment clause is merely a condition subsequent providing that, if the entire advance of the developer's money has not been fully paid from service revenues within a given period of years (10 years in some contracts; 20 years in others), the obligation of the utility to make any further payments out of revenues will be extinguished. This provision, however, does not affect the prior absolute obligation of the utility to pay the agreed percentage of service revenues as semi-annually received during the intervening ten year (or twenty year) period.

Defendant's further contention that the failure of the water contracts to provide for interest, or some equivalent return to the developer for use of his money, disqualifies them as evidence of indebtedness. We do not believe, however, that a promise, whether in a conventional revenue bond or in these water contracts, to pay money out of particular

revenues *without interest*, makes the promise any less a debt so far as payment of the principal is concerned. Such a no-interest clause, although unusual, is optional between the debtor and creditor and should not disqualify the evidence of indebtedness, if otherwise a capital asset, from the benefit of Section 1232(a).

Congress, amending the law to extend capital gain treatment to *retirement* as well as to true sale or exchange of capital assets, could hardly have intended such a narrow construction of the term debt as would in effect defeat the purpose of the legislation for no apparent good reason.

Overrestrictive constructions of Section 1232(a) and its predecessor Section 117(f) have been rejected in the past. In Toye v. United States, 157 F.Supp. 123 (E.D.La.1957) the court held that a letter issued by the receiver of an insolvent bank, evidencing frozen bank deposits, fell within "other evidence of indebtedness," as used in Section 117(f) saying "The government contends that Section 117(f) was never intended by Congress to include frozen (bank) deposit claims since such obligations are not ejusdem generis with the bonds, debentures and notes therein specifically mentioned. In effect, the government would restrict the scope of Section 117 (f) literally to 'bonds, debentures, notes or certificates' and treat 'other evidence of indebtedness' as surplusage."

In the identical case of Vance v. Kavanagh, 100 F.Supp. 899 (E.D.Mich.1951) the court, referring to "other evidence of indebtedness" said: "It is difficult to see how broader language could have been used in the statute."

Having in mind these considerations, we believe that the reference in Treas. Reg. § 1.1232–1 to bonds, debentures, notes or certificates or other evidence of indebtedness as "obligations," (a term broad enough to include evidence of conditional indebtedness of this kind) is not a mere reference of convenience, as argued by defendant, but a significant administrative construction of the statutory language as being broad enough to include such evidence of debt as revenue bonds and such similar evidence of debt as the water service contracts here involved.

Also indicative of the Congressional and departmental attitude toward evidences of debt payable from a special fund, e. g., revenue bonds or revenue debentures, are Section 103 of the Revenue Code providing that interest on obligations of governmental agencies is tax exempt, and Treas. Reg. 1.103–1 clearly stating that such obligations fall within that statute *even where* the principal payments (as in the water service contracts here involved and in other kinds of revenue bond obligations) are payable only out of a special fund.

Overrestrictive construction of Section 103, e. g., the contention that the obligations mentioned therein were not intended to include bonds payable only from a special fund, have also been rejected and the courts have held that bonds are entitled to the benefit of that section "even though payment is to be made only out of special funds and the credit of the municipality is not pledged." Commissioner of Internal Revenue v. Shamberg's Estate, 144 F.2d 998, 1006 (2d Cir. 1944) citing Bryant v. Commissioner of Internal Revenue, 111 F.2d 9, 17 (9th Cir. 1940).

The government has also argued in the past that Section 103 was narrowly intended to apply only to interest on conventional bonds or like securities, arising from a public agency's borrowing power. The courts have also rejected that argument, holding that ordinary bond contracts were entitled to the benefit of the section. See Kings County Dev. Co. v. Commissioner of Internal Revenue, 93 F. 2d 33, 35 (9th Cir. 1937).

Since our construction of the term "other evidence of indebtedness" comports with, rather than defeats the evident purpose of Congress, we are of the opinion that it is well within a variation of the strict, classic definitions of "debt" as allowed in tax cases. We believe that

the water service contracts in question, which might have been appropriately entitled "Revenue Bonds" or "Revenue Debentures" are sufficiently similar to revenue bonds or revenue debentures to be "other evidence of indetedness" within the meaning of Section 1232(a).

## AMOUNTS RECEIVED ON "RETIREMENT"

Defendant's third contention is that the amounts received by plaintiffs from the utility in payment of the water service contracts were not "payments received on retirement" of the utility's obligations within the meaning of Section 1232(a), citing Gerard v. Commissioner, 40 B.T.A. 64 (1939).

However, in Timken v. Commissioner, *supra*, the court held (p. 487) that interim payments on the "creditors notes" there involved were pro tanto retirements of it, rejecting the commission contention that only the final payment on a bond or note, or a single payment of the full amount can constitute "retirement" within the meaning of Section 1232(a). The court specifically rejected an earlier contrary indication in *Gerard* and cited McClain v. Commissioner of Internal Revenue, 311 U.S. 527, 61 S.Ct. 373, 85 L.Ed. 319 (1941).

In *McClain* the taxpayer had received payment for a bond of a water company, not in the usual manner of redemption, but in amount less than face value because the payor was in financial straits and the payee was willing to accept the lesser figure. The Court held that the term "retirement" is broader in scope than "redemption" and includes that term and, further, that the loss taken was capital within the meaning of Section 117(f), 1934 Act, predecessor statute of Section 1232(a).

Therefore, the Court concludes that the amounts received by plaintiffs from the utilities in payment of water service contracts were "payments received on retirement" of the utilities' obligations within the meaning of Section 1232(a).

Upon the agreed statement of facts, and the conclusions of law hereinabove set forth, the Court concludes that judgment should be entered in favor of plaintiffs as prayed.