Joseph ROSCOE, B. Waldine Roscoe, Harold A. Carr, Margaret P. Carr, Transferees,

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 14826.

United States Court of Appeals Fifth Circuit.

Sept. 3, 1954.

Howell Ward, Charles E. Pratt and Margaret B. Brown, Corpus Christi, Tex., Ward & Brown and Wood & Pratt, Corpus Christi, Tex., of counsel, for petitioners.

S. Dee Hanson, Sp. Asst. Atty. Gen., Ellis N. Slack, Morton K. Rothschild and H. Brian Holland, Asst. Attys. Gen., Daniel A. Taylor, Chief Counsel, John M. Morawski, Sp. Atty., Bureau of Internal Revenue, Washington, D. C., for respondent.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

RIVES, Circuit Judge.

These consolidated cases involve alleged deficiencies in income taxes for 1947, and present principally the issue of whether a portion of the amount received by petitioners from the sale of certain corporate stock in that year is properly taxable to them as capital gain or as ordinary income.

Taxpayers, Joseph Roscoe and Harold Carr, partners in the real estate business at Corpus Christi, Texas, filed separate income tax returns in 1947 on a cash basis. In April, 1946, taxpayers had jointly purchased fifty acres of land in Corpus Christi, Texas, together with two private investors, Goodfriend and Shellenberger, who were separately engaged in the retail clothing trade. In August, 1946, taxpayers and their associates formed the Greater Corpus Christi Development Company, which corporation issued 120 shares of stock, 20 shares being transferred to each of the taxpayers and 40 shares each to Goodfriend and Shellenberger. The fifty acres of land were conveyed to the corporation, which assumed a mortgage debt of $87,500 and executed a note for $44,775 payable to taxpayers' associates.

In September, 1946, an agreement was executed between the corporation and taxpayers' real estate partnership whereby the corporation agreed to subdivide the 50 acre tract into city lots and otherwise improve the property at its own expense. The partnership thereby agreed "to manage and supervise all details in connection with the subdividing of said land", and was to have the "sole and exclusive right" to sell the lots, for which service it was entitled to a 10% commission based on the sale price of the lots.

Pursuant to the above arrangement, the 50 acre tract was divided into 218 city lots, after which two other individuals, Bell and Hendricks, became interested in purchasing 40 of the lots and later the entire tract. After some negotiations between taxpayers, acting for the corporation, and Bell and Hendricks, during the progress of which tax counsel was consulted, a plan was devised whereby Bell and Hendricks would purchase the entire stock of the corporation rather than the 50 acre tract of land constituting its main asset. Accordingly, the entire 120 shares of stock were sold to Bell and Hendricks on April 25, 1947 for $121,179.06, in consideration of which those individuals assumed the outstanding obligations of the corporation, consisting of the aforementioned mortgage debt and note to Goodfriend and Shellenberger. As a part of the transaction, taxpayer cancelled that provision of the agreement of their real estate partnership with the corporation giving them the exclusive agency to sell the lots at a 10% commission.

The two stockholders, Goodfriend and Shellenberger, each received $31,944.55 for their respective 40 shares of stock in the above exchange, but taxpayers together received a total sum of $57,289.96 for their combined 40 shares, $31,944.55 of which amount the Tax Court found "represented payment for 40 shares of the stock", and the excess of $25,345.40, or the remaining amount over and

above the sum received by the other two stockholders for the same number of shares, actually represented additional compensation for services, which was taxable as ordinary income rather than as capital gain.

Taxpayers insist that their proportionate share of the amount received for their stock in the corporation is properly taxable to them at the long-term capital gain rate, rather than as ordinary income, and that the contrary determinations by both the Commissioner and Tax Court are clearly erroneous as based purely on inference and suspicion and unsupported by any credible testimony; that the substance of the agreement effecting the exchange of stock, as well as uncontradicted testimony, compels a finding that Bell and Hendricks' payment to them of the entire $57,289.96 was solely in consideration for the sale of their stock,[1] and the Tax Court's contrary finding that $25,345.40 of that amount represented ordinary income to taxpayers for services rendered ignores the realities of the transaction, and unfairly penalizes legitimate tax avoidance by taxing the motive for the deed.

The Commissioner, though acknowledging the existence of testimony to the effect that taxpayers received the excess sum for their stock, nevertheless insists that other testimony and inferences therefrom clearly support the finding that it actually represented payment to taxpayers for services rendered either in managing and supervising the project,[2] or was intended indirectly to reimburse them for their previously agreed upon commission payable upon direct sale of the lots under the simultaneously

1. In this connection, taxpayer Joseph Roscoe testified:

"Q. Well, when you got this offer of $121,000 for the entire capital, did you discuss that with Mr. Goodfriend and Mr. Shellenberger? A. Yes, sir.

"Q. Did you and they fix a price for your stock at that time? Tell us about that, how you arrived at that proposition. A. Naturally, we felt that our contract was a valuable contract, because it was a definite 10 percent commission, based on the sale of any or all of the subdivision. And I think, if I remember rightly, it had no expiration date. It was a contract that was to carry on during the life of the subdivision until it was all sold by us. And naturally we felt that we had a valuable contract.

"We felt that due to that, and a certain earning that would accrue on the basis of that contract, we didn't know how much or how little, but it was bound to bring in some income, we felt that our stock had a value to us greater than it would to the other individuals.

"We discussed that very frankly with the other two stockholders, and we found no objection; in fact they considered the same thing. And when it was agreeable, why, I don't remember the exact figures—I believe $25,000 plus was agreed as being agreeable to the other stockholders for us to ask for, in addition to the basis of the sale of their stock, and the matter of fact is, we definitely would not, and made it clear that we would not on that basis sell our stock, unless they arrived at the figure we wanted for our stock.

"Q. Which came to about twenty-eight thousand that you were to receive for your stock, each of you? A. Twenty-eight thousand plus a few dollars; I don't remember the exact figure there.

"And the purchasers of the corporation would not purchase part of the stock; they wanted the entire stock of the entire corporation, and therefore it was agreeable all around, and the deal was made on this basis.

"Q. So that Mr. Goodfriend and Mr. Shellenberger agreed that you and Mr. Carr might have twenty-eight some odd thousand dollars for your stock? A. Yes, sir.

"Q. And that they were to keep the thirty-one thousand for their 40 shares? A. I think those are the figures."

2. The witness, Goodfriend, testified:

"Q. You mean the stockholders had an agreement among themselves that if the stock was sold, that Mr. Roscoe and Mr. Carr would get more for their 20 shares each than you and Mr. Shellenberger would get for your 40 shares? A. That's the agreement that we had, the contract we had with them.

"Q. Then are you saying that this additional amount received by Mr. Roscoe and Carr was in consideration for the rights they had under the contract? A. Well, we wasn't discussing exactly where the consideration for that being exactly for that amount, but we knew they'd have to get more money; for us to sell

cancelled agency contract; that this being primarily a fact case, the Tax Court was not bound to accept taxpayers' version of the transaction as binding for tax purposes, but properly looked through the form to the substance of the transaction irrespective of their motives taxwise.

While it is generally recognized that the motive to avoid taxes cannot condemn a transaction otherwise legal,[3] it is also true that the Tax Court, in order to prevent diminution of revenue legitimately due, is not bound to accept taxpayers' version of a transaction as having the binding effect vis-a-vis taxation intended by the parties, particularly where, as here, other testimony and inferences lend support to its conclusion that it represented an agreed method of indirectly compensating parties for services rendered. Helvering v. National Grocery Co., 304 U.S. 282, 294–295, 58 S.Ct. 932, 82 L.Ed. 1346; Burford-Toothaker Tractor Co. v. Commissioner, 5 Cir., 192 F.2d 633, 635; Carmack v. Commissioner, 5 Cir., 183 F.2d 1.

Here, in addition to the witness Goodfriend's admission that the excess sum was paid taxpayers "for the work they had done in supervising the subdivision", the Tax Court relied upon circumstances showing that Bell and Hendricks, though ostensibly purchasing only the corporate stock for $121,179.06, actually contracted to buy the 50 acre tract of land owned by the corporation for $253,454.06;[4] that "the excess of $25,345.40 which (taxpayer) received for the 40 shares of stock is exactly 10 per cent of the aggregate consideration exchanged for the land", a sum identical with the commission which taxpayers were entitled to receive upon a direct sale of the land under their agency contract; and finally, other than taxpayer Roscoe's bare assertion that "we figured our stock was worth that much more money", there was no convincing testimony that taxpayers' combined 40 shares of stock were any more valuable than the identical number of shares sold in the same transaction by Goodfriend and Shellenberger, so as to lend support to the contention that the consideration paid was solely in exchange for the stock. While none of these facts and circumstances viewed separately are conclusive, nevertheless, when considered in the light of taxpayers' activities in managing and supervising the project development and their active participation in the negotiations resulting in the sale of the stock and the vendees' acquisition of the land, we think the Tax Court was justified in concluding that the excess amount received by taxpayers constituted ordinary income, rather than proceeds from the sale of their stock. In any event, we cannot reasonably view the Tax Court's conclusion here reversible as "clearly erroneous". United States v. U. S. Gypsum Co., 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746; Burford-Toothaker Tractor Co. v. Commissioner, supra.

In the alternative, the taxpayers contended before the Tax Court that, if any portion of the consideration was paid for the cancellation or termination of the exclusive contract, the gain therefrom was a capital gain. The Tax Court found no evidence to support that

that stock, they'd have to realize more money.

"Q. For the work they had done in supervising the subdivision? A. That's what it is, yes. So we figured that is the best, for us to go ahead and just sell that stock on that price."

3. United States v. Cumberland Public Service Co., 338 U.S. 451, 455, 70 S.Ct. 280, 94 L.Ed. 251; Howell Turpentine Company v. Commissioner, 5 Cir., 162 F.2d 319, 323; Commissioner v. National Carbide Corporation, 2 Cir., 167 F.2d 304, 306.

4. This total consideration which passed in the stock exchange transaction was ascertained by adding the figure paid for all the corporate stock, or $121,179.06, to the $87,500.00 mortgage debt and $44,775.00 note to Goodfriend and Shellenberger which Bell and Hendricks assumed, and later paid, under the agreement for the sale of the stock.

alternative contention. If, however, we assume arguendo that the substance of the transaction amounted to the payment of $25,345.41 as consideration for the cancellation of the sales contract, that sum was nevertheless ordinary income under Section 22(a) of the Internal Revenue Code, 26 U.S.C.A. § 22(a), and not capital gain under Section 117(a) (4) and (10), 26 U.S.C.A. § 117(a) (4, 10). Commissioner v. Starr Bros., 2 Cir., 204 F.2d 673; General Artists Corp. v. Commissioner, 2 Cir., 205 F.2d 360; cf. Commissioner v. Ray, 5 Cir., 210 F.2d 390, and Commissioner v. McCue Brothers & Drummond, Inc., 2 Cir., 210 F.2d 752.

The decisions of the Tax Court are Affirmed.

STRUM, Circuit Judge, participated in the hearing and decision of this cause but died before the opinion was filed.