Roger J. Kathman and Ethel D. Kathman, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 599–66.   Filed April 23, 1968

*William I. Bubenzer*, for the petitioners.
*Rodney G. Haworth*, for the respondent.

Tietjens, *Judge:* The commissioner determined defficiencies in income taxes for the taxable year 1961 in the amount of $3,214.83, all of which is in dispute except that portion which petitioner has conceded relating to respondent's adjustment of $500 for a mathematical error. The sole question is whether certain amounts received by Roger Kathman during 1961, for the release of three individual distributors from their obligation to purchase certain products solely from him, constituted ordinary income or capital gains.

### FINDINGS OF FACT

Some of the facts are stipulated. The stipulation and attached exhibits are herein incorporated by this reference.

Roger J. Kathman and his wife Ethel (for purposes of this opinion only Roger Kathman will be referred to as petitioner), reside in South Fort Mitchell, Ky., and were residents there at the time they filed their petition to this Court. They filed their income tax return for the taxable year 1961 with the district director of internal revenue, Louisville, Ky.

During 1961, petitioner was engaged in marketing food supplements produced and distributed by the Nutri-Bio Corp. (hereinafter sometimes referred to as the company), Beverly Hills, Calif. In 1959 he became associated with the company as a distributor. As such, he began recruiting subordinate distributors under him for the purpose of selling and distributing the company's products.

In August of 1960, petitioner was promoted to "Group Coordinator." He qualified for the position under an agreement with the company by distributing a gross amount of $25,000 of the Nutri-Bio products in a period of a month and by purchasing his release from his own group coordinator for $10,000.

Under this agreement with the company, petitioner, as a group coordinator, was required to purchase all his inventory of merchandise directly from the Nutri-Bio Corp. at a substantial discount from the retail price and agreed to have on hand in inventory, or warehoused with the company, or be prepared to purchase a minimum of $5,000 of product, literature, and sales aids at cost. The inventory and purchases of petitioner, as a group coordinator, were sold at lesser discounts to the salesmen or distributors who were below him in his distribution chain. The company agreed to reimburse petitioner for the payment of override commissions exceeding 2 percent so that at all times the petitioner as a group coordinator would enjoy a minimum of 2-percent commission on all purchases in his chain. When the salesmen or distributors to whom a group coordinator sold reached a total monthly volume of $100,000, the group coordinator's discount on purchases from the company was 68 percent. However, in the event such volume was not attained or, if attained, was not maintained or repeated during 1 month of the next 3 months, the group coordinator was nevertheless entitled to buy at a discount of 66 percent.

In August of 1960, petitioner, in connection with his becoming a group coordinator, executed a document entitled "Nutri-Bio Group Coordinator Agreement." This agreement was signed by Paul R. Watson, secretary-treasurer of the company, and provided in part:

Preliminary Qualifications for a Distributor to become a Group Coordinator:
He must have $10,000.00 in cash with which to purchase his "release" from his Group Coordinator to cover the Group Coordinator's loss of income through agreeing to his release.

During 1961, in accordance with the provisions of the aforementioned agreement, petitioner "released" Lee Dreyfoos, Frank J. Ulrich, and Louis J. Anon, from his sponsorship, as distributors and salesmen in his distribution chain, so that they could become group coordinators. These releases enabled these men to purchase the company's products directly from Nutri-Bio Corp. and at a larger discount than they had previously enjoyed when purchasing directly from petitioner. In consideration for their release by petitioner, each distributor paid him $10,000. Each payment was sent to Nutri-Bio which then remitted the payments to petitioner minus $47.48, an amount owed Nutri-Bio by petitioner.

Petitioner reported the transactions in Schedule D of his 1961 Federal income tax return in the following manner:

LONG-TERM CAPITAL GAINS AND LOSSES—ASSETS HELD MORE THAN 6 MONTHS

| Kind of property | Date acquired | Date sold | Gross sales price | Depreciation allowed | Cost or other basis | Expense of sale | Gain or loss |
|---|---|---|---|---|---|---|---|
| Commission rights | August 1960 | May 1961 | $9,952.52 | None | $3,333.33 | None | $6,619.19 |
| Do | August 1960 | June 1961 | 10,000.00 | None | 3,333.33 | None | 6,666.67 |
| Do | August 1960 | September 1961 | 10,000.00 | None | 3,333.33 | None | 6,666.67 |
| Net long-term gain | | | | | | | 19,952.53 |

For at least a year thereafter, petitioner remained a group coordinator for the company, and spent considerable time recruiting additional salesmen to join his distribution chain.

On November 10, 1965, respondent sent petitioner a statutory notice of deficiency. In the explanation of adjustments attached to the deficiency notice, respondent stated:

> It is held that the payments totaling $30,000.00 received by you from three of your salesmen in consideration for their release are ordinary income; that the payments do not constitute proceeds from the sale or exchange of a capital asset within the meaning of the Internal Revenue Code.

### ULTIMATE FINDING

Transactions pursuant to which petitioner released the above-named individuals from their obligation to purchase from him did not involve the sale or exchange of capital assets and the payments were ordinary income to petitioner.

### OPINION

The sole issue is whether the transactions between petitioner and the individuals described in the findings of fact, involving the right to purchase and sell Nutri-Bio products, qualify as the sale or exchange of capital assets under section 1221,[1] I.R.C. 1954. If they do, any gain is taxable as capital gain. If not, the amounts received by petitioner are ordinary income. Petitioner's argument on this point is that his rights under his "Nutri-Bio Group Coordinator Agreement" must be a capital asset because they were property, and as property they did not come within the exclusions in section 1221, I.R.C. 1954.

The Supreme Court disposed of this argument in *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130, 134–135 (1960), when it stated:

---

[1] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business ;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business ;

(3) a copyright, a literary, musical, or artistic composition, or similar property, held by—

(A) a taxpayer whose personal efforts created such property, or

(B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property ;

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1) ; or

(5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

While a capital asset is defined in § 117(a)(1) [predecessor to sec. 1221] as "property held by the taxpayer," it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. * * * Thus the Court has held that an unexpired lease, * * * corn futures, * * * and oil payment rights, * * * are not capital assets even though they are concededly "property" interests in the ordinary sense. * * *

Furthermore, the Supreme Court, in several other cases, has repeated that the capital gains provisions of the revenue statutes are an exception from the normal tax treatment of income and must be narrowly construed. *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52 (1955); *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958); and *Burnet* v. *Harmel*, 287 U.S. 103 (1932). Guided by this often-declared admonition, we decide the present case against the petitioner.

A simple answer to the question of what constitutes a capital asset has remained elusive, as is evidenced by the large number of cases in the area. We believe, however, that Judge Friendly in *Commissioner* v. *Ferrer*, 304 F. 2d 125, 127–128 (C.A. 2, 1962), modifying 35 T.C. 617, has provided a good guideline definition when he stated:

One common characteristic of the group held to come within the capital gain provision is that the taxpayer had either what might be called an "estate" in (Golonsky,[2] McCue,[3] Metropolitan [4]), or an "encumbrance" on (Ray [5]), or an option to acquire an interest in (Dorman [6]), property which, if itself held, would be a capital asset. In all these cases the taxpayer had something more than an opportunity, afforded by contract, to obtain periodic receipts of income, by dealing with another (Starr,[7] Leh,[8] General Artists,[9] Pittston [10]), or by rendering services (Holt [11]), or by virtue of ownership of a larger "estate" (Hort,[12] P. G. Lake [13]). * * *

Petitioner's right to commissions from his subordinate salesmen falls clearly within Judge Friendly's characterization of merely "an

---

[2] *Isadore Golonsky*, 16 T.C. 1450, affd. 200 F. 2d 72 (C.A. 3, 1952), certiorari denied 345 U.S. 939.

[3] *McCue Bros. & Drummond, Inc.*, 19 T.C. 667, affd. 210 F. 2d 752 (C.A. 2, 1954), certiorari denied 348 U.S. 829.

[4] *Metropolitan Building Co.* v. *Commissioner*, 282 F. 2d 592 (C.A. 9, 1960), reversing 31 T.C. 971.

[5] *Louis W. Ray*, 18 T.C. 438, affd. 210 F. 2d 390 (C.A. 5, 1954), certiorari denied 348 U.S. 829.

[6] *Dorman* v. *United States*, 296 F. 2d 27 (C.A. 9, 1961).

[7] *Commissioner* v. *Starr Bros., Inc.*, 204 F. 2d 673 (C.A. 2, 1953), reversing 18 T.C. 149.

[8] *Marc D. Leh*, 27 T.C. 892, affd. 260 F. 2d 489 (C.A. 9, 1958).

[9] *General Artists Corp.*, 17 T.C. 1517, affd. 205 F. 2d 360 (C.A. 2, 1953), certiorari denied 346 U.S. 866.

[10] *Commissioner* v. *Pittston Co.*, 252 F. 2d 344 (C.A. 2, 1958), reversing 26 T.C. 967, certiorari denied 357 U.S. 919.

[11] *Nat Holt*, 35 T.C. 588, affd. 303 F. 2d 687 (C.A. 9, 1962).

[12] *Hort* v. *Commissioner*, 313 U.S. 28 (1941).

[13] *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260.

opportunity, afforded by contract, to obtain periodic receipts of income, by dealing with another."

In the present case, the consideration received for the release was nothing more than a substitute for future commissions to be received by petitioner and, as such, should be treated as ordinary income. *Bisbee-Baldwin Corp.* v. *Tomlinson*, 320 F. 2d 929, 935 (C.A. 5, 1963). The group coordinator's contract between petitioner and Nutri-Bio Corp. characterized the payment as a means "to cover the Group Coordinator's loss of income through agreeing to * * * [the] release." The loss of income was evident, because petitioner had been guaranteed a minimum of 2 percent of any future sales made by his subordinates, and the $10,000 was the amount agreed upon to compensate petitioner for the loss of future income when the subordinates were released from their obligation to purchase from petitioner. Absent the transfer by petitioner of something more, we find the payments were merely a substitute for the future commissions petitioner might receive from the subordinate salesmen, and do not qualify for capital gains treatment.

We believe petitioner's right to earn commissions distributing Nutri-Bio products is somewhat analogous to the rights provided under a mortgage-servicing contract. Under such contracts, the mortgage servicer earns a commission by providing certain services (i.e., collecting the principal, interest, and escrow moneys and disbursing these to the proper parties), for the investor's mortgage portfolio.

The servicer, having the exclusive right to service the mortgage, possesses a valuable asset. However, his right has value only because of income which could be earned in the future by providing services under the contract. When nothing more than this right is transferred, the amount paid by the purchaser merely represents a substitute for the future income and thus is taxable as ordinary income. *Bisbee-Baldwin Corp.* v. *Tomlinson, supra; United States* v. *Eidson*, 310 F. 2d 111 (C.A. 5, 1962).

Similarly, petitioner possessed the exclusive right to provide various services for Nutri-Bio Corp. (i.e., distributing products to the salesmen in his chain of distribution and aiding in the promotional aspects of marketing the product within his chain). For this, he too received a commission based solely upon the performance of the salesmen under him. Accordingly, the amounts paid petitioner by his subordinate salesmen to release them from the obligation to purchase from him, thus enabling them to become group coordinators on their own, merely represented an estimate of the present value of the commissions which petitioner would have earned through them in the future. As the mortgage-servicing situation is parallel to the present case, we can ascertain no reason for treating the gain from the release

of petitioner's contract right any differently taxwise than the gain from the sale or release of a mortgage-servicing contract.

A quick examination of some other cases in the area is helpful for it illustrates that in similar situations capital gains treatment has been denied. For instance, gains derived from the sale of automatically renewable commissions on insurance contracts,[14] the transfer of an annuity policy prior to its maturity,[15] the sale of a contract to receive fees from the performance of personal services,[16] the sale of incomplete contracts,[17] the cancellation of a contract to furnish electrical energy,[18] and the cancellation of an employment contract,[19] were treated as *ordinary* income and not as capital gains.

Furthermore, a contract to transmit recorded music programs was not a capital asset, hence, ordinary income treatment was applied to the gain on its sale, *King Broadcasting Co.*, 48 T.C. 542, 550. Also, where what was sold was merely the management contract of an insurance agency, this too was found to be ordinary income. *Hyatt* v. *Commissioner*, 325 F. 2d 715 (C.A. 5, 1963), affirming per curiam a Memorandum Opinion of this Court, certiorari denied 379 U.S. 832; and *Joseph W. Brown*, 40 T.C. 861.

Similarly, we hold that in the instant case, the gain received from the transfer, assignment, or release of petitioner's arrangement with his subordinate salesmen, no matter how it might otherwise be characterized, must be treated as ordinary income for tax purposes. The consideration received for the cancellation of petitioner's right to earn commissions in the future through the particular salesmen involved was nothing more than a substitute for future income.

*Decision will be entered for the respondent.*

---

[14] *Floyd L. Turner*, 38 T.C. 304.
[15] *Arnfeld* v. *United States*, 143 Ct. Cl. 277, 163 F. Supp. 865 (1958), certiorari denied 359 U.S. 943 ; *Bolling Jones, Jr.*, 39 T.C. 404.
[16] *Wilkinson* v. *United States*, 157 Ct. Cl. 847, 304 F. 2d 469 (1962).
[17] *Pridemark, Inc.* v. *Commissioner*, 345 F. 2d 35 (C.A. 4, 1965), affirming on this point 42 T.C. 510.
[18] *Appalachian Electric Power Co.* v. *United States*, 158 F. Supp. 138 (Ct. Cl. 1958).
[19] *Thurlow E. McFall*, 34 B.T.A. 108 ; *F. W. Jessop*, 16 T.C. 491 ; *Tate* v. *Knox*, 131 F. Supp. 514 (D. Minn. 1955) ; and *David L. Gordon*, 29 T.C. 510, affd. 262 F. 2d 413 (C.A. 5, 1958).